UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| THE LAMAR COMPANY, LLC, | ) | |
| | ) | Civil Action No. 5: 21-043-DCR |
| Plaintiff, | ) | consolidated with |
| | ) | Civil Action No. 5: 21-089-DCR |
| V. | ) | |
| | ) | |
| LEXINGTON-FAYETTE URBAN | ) | **MEMORANDUM OPINION** |
| COUNTY GOVERNMENT, | ) | **AND ORDER** |
| | ) | |
| Defendant. | ) | |

*** *** *** ***

The Lamar Company, LLC ("Lamar") wanted to digitize its billboards. To accomplish this, it filed applications with the Lexington-Fayette Urban County Government ("LFUCG") but those applications were denied under provisions of LFUCG's then-current ordinance regulating signs ("ordinance"). Lamar filed this action on February 10, 2021, claiming that the ordinance violates the First and Fourteenth Amendments to the United States Constitution and Sections 1, 2 and 8 of the Kentucky Constitution. [Record No. 1]

The defendant has moved for summary judgment on all claims and the plaintiff moved for partial summary judgment. For reasons that follow, the Court will grant the defendant's motion abd the plaintiff's motion will be denied.

## I. Background

The LFUCG Council enacted an ordinance in 1983 to regulate the use of signs in the Lexington, Kentucky area. [Record No. 1-1, p. 2, Section 17-1] The stated purpose was to encourage business and marketing activities, ensure that signs did not "unduly detract from the overall aesthetics of the community," and promote traffic safety by "minimizing the undue

distraction of the motoring public." [*Id.*] The ordinance defined a sign as "any writing, pictorial representation . . . or device by reason of its form, color, wording, symbol, design, illumination, motion or other characteristic is designed to attract attention to the subject thereof or is used as a means of identification, advertisement, announcement, or of illustrating products." [*Id.* at p. 3, Section 17-3(a)] Any party wishing to display a sign within county limits was required to apply for a permit, and "[a]ny sign not specifically permitted [was] deemed as prohibited." [*Id.* at p. 12, Section 17-7]

The ordinance regulated signs by category. Section 17-3(b) defined signs "based upon the nature of the information they intend to provide," with definitions for an "Advertising Sign," "Business Sign," "Directional Sign," "Government Sign," "Incidental Sign," "Informational Sign," "Political Sign," and "Temporary Sign." [*Id.* at pp. 3-4, Section 17-3(b)(1), (4), (6), (8), (10), (12), (17), (19)] By contrast, Section 17-3(d) defined signs "by certain design features." [*Id.* at p. 6, Section 17-3(d)] The ordinance defined an "Electronic Message Display System" ("EMDS") as a sign that "includes, but is not limited to reflective disc, direct illumination, rotating veins, light emitting diodes (LEDs), or liquid crystal diodes (LCDs), and is controlled by means of a central computer or video control system and which has no audible sound." [*Id.* at p. 6, Section 17-3(d)(5)]

EMDS signs were generally prohibited under the ordinance, with limited exceptions for specific zoning categories. The ordinance permitted EMDS a sign in the Highway Service Business Zone if it was "part of a permitted free-standing or wall-mounted advertising or business sign for an indoor or outdoor stadium or arena . . . having a permanent seating capacity in excess of five thousand (5,000) persons for athletic and cultural events." [*Id.* at pp. 17-18, Section 17-7(g)(7)] EMDS signs permitted under this subsection could not "exceed[] fifty (50)

- 2 -

percent of the total sign area of the permitted sign" and were limited to displaying messages "to notify the public of events to be held in the stadium or arena." [*Id.*]

The ordinance permitted "wall-mounted" EMDS signs in Downtown Business Zones for "civic centers which contain exhibition halls and an arena for athletic and cultural events; for hotels and motels containing conference centers and restaurants; for television and radio system signal distribution centers and studios; and for banks, securities and commodities brokers, credit institutions, savings and loans, and investment companies." [*Id.* at p. 20, Section 17-7(h)(7)] The ordinance further provided that EMDS signs in Downtown Business Zones could not exceed 80 square feet per sign, and that only one electronic message display center with a maximum of two signs was permitted per street front. [*Id.*]

Finally, the ordinance permitted the display of EMDS signs in the Lexington Center Business Zone. [*Id.* at p. 21, Section 17-7(i)(2)] Under Section 17-7(i)(2), wall-mounted EMDS signs were permitted for civic centers "contain[ing] exhibition halls and an arena for athletic and cultural events." [*Id.*] Two EMDS signs no larger than 200 square feet each could be used "only to notify the public of special events in the civic center or to provide public service information." [*Id.*] Additionally, two EMDS signs not exceeding 50 square feet could be used "exclusively for directional and/or informational purposes." [*Id.*]

Parts of the ordinance describing the permitting process stated that any permit application must include a "site plan . . . showing the location of the proposed sign(s) on the lot" and "detailed sign information, including type of construction, method of illumination, dimensions, copy, method of mounting and/or erecting and other similar information." [*Id.* at p. 8, Section 17-4] The ordinance further provided that certain categories of signs were exempt from the permit requirement but were nonetheless "subject to applicable restrictions contained

within [the ordinance]."  [*Id.* at p. 8, Section 17-4(a), (c) (exempting "Political Signs," "Nameplates," "Government Signs," "Real Estate Signs," "Incidental Signs," "Window Signs," and "the changing of copy on a billboard . . . [or EMDS sign]")] Certain signs were excluded from the ordinance altogether, including official government notices, flags, works of fine art, and temporary decorations.  [*Id.* at p. 2, Section 17-2(a)-(h)] Violations of the ordinance constituted a misdemeanor that could be punished by fines or penalties.  [*Id.* at p. 27, Section 17-14]

Lamar is an advertising company that "owns and controls over one hundred billboards within Fayette County, Kentucky."  [Record No. 63-1, p. 1] Its billboards present information on commercial and noncommercial topics.  [*Id.* at p. 2 (noting that billboards display messages on topics including "news, political advocacy, public policy, religion, sports, the arts, health, Amber Alerts, Golden Alerts, public safety, public service, and emergency police and FBI advisories")] On September 22, 2020, Lamar filed applications seeking permits to convert 20 existing billboards to EMDS signs.  [Record No. 1-2] LFUCG denied the applications under the ordinance on October 12, 2020, noting that the signs were "Disapproved Digital Billboard[s]" and "non-permitted sign type[s]."  [*Id.* at p. 4]   Lamar filed this action four months later.  [Record No. 1]

Lamar asserts five claims against LFUCG in its Complaint.[1]  It first alleges that the ordinance's ban of off-premises digital signs, while permitting on-premises digital signs in

---

[1]      Lockridge Outdoor Advertising, LLC ("Lockridge") filed a Complaint against LFUCG alleging similar claims.  *See* Lexington Civil Action No. 5: 21-089 [Record No. 1]. Lockridge's claims for injunctive and declaratory relief were dismissed as moot after LFUCG amended the ordinance.  Lexington Civil Action No. 5: 21-089 [Record No. 17].  This Court granted Lockridge's motion to consolidate its case with Lamar's after Lockridge reported that Lamar "purchased all of Lockridge's interest in . . . [the] signs" that were the subject of its

limited circumstances, is a "content-based restriction of . . . free speech that fails to meet strict scrutiny" in violation of the First and Fourteenth Amendments to the Constitution (Count 1). [*Id.* at p. 16] Alternatively, Lamar contends in Count 3 that the ordinance's on-premises/off-premises distinction constituted a content-neutral restriction that fails to meet intermediate scrutiny. [*Id.* at p. 31] The plaintiff next claims that the ordinance should be stricken in its entirety because it contains "dozens of separate unconstitutional content-based restrictions of free speech" (Count 2). [*Id.* at p. 22] Lamar contends that the ordinance's permitting scheme constitutes an "unconstitutional prior restraint of speech" under the First and Fourteenth Amendments (Count 4). [*Id.* at p. 33] Finally, it seeks declaratory relief (Count 5). [*Id.* at p. 37]

The ordinance was repealed and replaced by a new sign regulation on March 18, 2021. [Record No. 65-10] LFUCG amended the ordinance by removing any content-based distinctions in response to the Supreme Court's decision in *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015). [Record No. 52-5] The new ordinance rendered Lamar's claims for declaratory and injunctive relief moot. [Record No. 19]

This matter was stayed pending the Supreme Court's decision in *City of Austin, Texas v. Reagan National Advertising of Austin, Inc*., 142 S. Ct. 1464 (2022). [Record No. 19] Following discovery, the parties filed cross-motions for summary judgment on April 14, 2023. [Record Nos. 63, 65] Lamar also moved to exclude the testimony and opinions of Dr. Eric Kelly under Rule 702 of the Federal Rules of Evidence and LFUCG filed a motion to strike the plaintiff's request for compensatory damages. [Record Nos. 64, 66]

---

Complaint. Lexington Civil Action No. 5: 21-089 [Record No. 32]. The parties' claims are consolidated for review.

## II.  The Motion to Exclude the Opinions of Dr. Kelly

Dr. Eric Damian Kelly is a licensed attorney and a professor of Urban Planning at Ball State University.  He provided a written report on behalf of LFUCG addressing the government's potential purposes in enacting the ordinance and whether the ordinance is "broader than necessary to fulfill those purposes."  [Record No. 64-1, p. 1]  Lamar moved *in limine* to exclude Dr. Kelly's report and opinions pursuant to Rule 702 of the Federal Rules of Civil Procedure.  [Record No. 64]  The plaintiff claims that Dr. Kelly's testimony and report should be excluded because: (1) the report "offer[s] impermissible legal conclusions" and (2) his opinions are not supported by reliable data or formed through reliable methods.  [*Id.* at pp. 6-15]

Rule 702 of the Federal Rules of Evidence imposes a "gatekeeping" duty on courts, which requires that they ensure that expert testimony "rests on a reliable foundation and is relevant to the task at hand."  *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999).  The party proffering expert testimony must show by a preponderance of the evidence that the expert whose testimony is being offered is "qualified and will testify to [specialized] knowledge that will assist the trier of fact in understanding and disposing of relevant issues."  *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 478 (6th Cir. 2008).

### A.  Dr. Kelly's Report Offers Legal Conclusions.

Lamar argues that Dr. Kelly's report should be excluded because it impermissibly "uses specialized legal terminology" and offers legal conclusions by stating that the ordinance is rationally related to the government's stated interests.  [Record No. 64, pp. 7-8] Conversely,

LFUCG contends that the report does not offer legal conclusions, but instead "embrace[s] the issue of the government interests enumerated in the [ordinance]."  [Record No. 74, pp. 2-3]

As the Sixth Circuit has explained, expert witnesses "may not tell the jury 'what result to reach' on 'ultimate legal question[s]' because such statements also 'invade the province of the jury.'"  *Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308, 316 (6th Cir. 2019) (collecting cases).  However, it has recognized that "there is a 'subtle,' but 'nonetheless important' distinction between 'opin[ing] on the ultimate question of liability' (impermissible), and 'stating opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue' (permissible)."  *Id.* at 317 (citing *Berry v. City of Detroit*, 25 F.3d 1342, 1353 (6th Cir. 1994)).

In *Berry*, the court concluded that an expert improperly provided a legal conclusion when he testified that the defendant's "failure to . . . train [its police] officers not to use improper deadly force constitute[s] a pattern of gross negligence."  25 F.3d at 1353.  It reasoned that, while an expert may "stat[e] opinions that suggest the answer to the ultimate issue or that give the jury all the information from which it can draw inferences as to the ultimate issue," the testimony that the City's actions amounted to gross negligence was impermissible because it "opine[d] on the issue of ultimate liability."  *Id.* at 1353-54.  Additionally, the expert's use of legal terms such as "gross negligence" and "deliberate indifference" were concerning because "it is the responsibility of the court, not testifying witnesses, to define legal terms."  *Id.* at 1354; *see also Killion v. KeHE Distribs.*, 761 F.3d 574, 593 (6th Cir. 2014) (affirming district court's exclusion of expert report that "plainly attempts to define legal terms").

Here, Dr. Kelly's report contains inadmissible legal conclusions.  Like in *Berry*, the expert's testimony that LFUCG "has identified several substantial interests . . . [that] are rationally related to and directly advanced by the ordinance" opines on the ultimate issue of liability in this matter: namely, whether the ordinance satisfies the requisite level of scrutiny under the First Amendment.  [*See* Record No. 64-1, p. 3.]  Rather than "meaningfully assist[ing] a jury," the report's references to tiers of scrutiny constitutes "conclusory statements based upon [Dr. Kelly's] interpretation of the [evidence]" that must be excluded under Rule 702.  *Brown v. City of Shelbyville, Tenn.*, No. 1:19-CV-152, 2020 WL 13173275, at *9 (E.D. Tenn. Sept. 17, 2020).  Further, several opinions contained in the report are inadmissible because they use "'specialized' legal terminology," including the terms "substantial governmental interest," "rationally related to," and "no more restrictive than necessary." *Babb*, 942 F.3d at 317.

The defendant contends that Dr. Kelly's statements are permissible because he "does not even use the word constitutional in his report."  [Record No. 74, p. 3] But use of the word "constitutional" is not the litmus test for determining whether an opinion offers a legal conclusion.  Instead, testimony may be excluded for "communicating a legal standard— explicit or implicit—to the jury," regardless of whether specific words are used.  *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992).

The defendant also claims that Dr. Kelly's statements are comparable to those contained in an expert report that was deemed admissible in *Adams Outdoor Advertising Limited Partnership v. City of Madison*, No. 17-CV-576-JDP, 2018 WL 6437941 (W.D. Wisc. June 7, 2019).  There, Jerry Wachtel stated that the challenged ordinance "serves the City's stated interest, that of traffic safety," that "[t]here is a compelling interest behind the . . .

regulations," and that "the City's Sign Control Ordinance directly and appropriately addresses the City's stated purposes." *Id.*

This Court is not bound by an unpublished decision from the Western District of Wisconsin. Regardless, the language used in the *Adams* report is distinguishable. Wachtel may have included language somewhat like that used in evaluating the constitutionality of an ordinance, but Dr. Kelly's report contains terms of art that closely imitate relevant legal standards, and that he recognized carry a specialized meaning in the context of First Amendment challenges. [*See, e.g.*, Record No. 64-1, p. 12 ("[I]t is clear that LFUCG had a rational basis in regulating signs . . . [and that the ordinance] directly advances the [government's] substantial interest in traffic safety.")]

The report's references to caselaw is also excludable as offering legal conclusions. Dr. Kelly cites decisions from state and federal courts to support his findings that LFUCG's regulation of billboards was warranted. For example, he cites a Kentucky Supreme Court decision holding that a government could regulate junkyards out of a concern for "aesthetic considerations" in support of his assertion that the defendant was justified in restricting digital signs for a similar purpose. [Record No. 64-1, p. 7 (citing *Jasper v. Commonwealth*, 375 S.W.2d 709, 711 (Ky. 1981))]

LFUCG argues that the citations are only "offered for [their] analogousness" and do not refer to the ultimate issue in this case. But even if the cited cases do not directly address the constitutionality of LFUCG's ordinance, they are excludible because they are irrelevant. The cited holdings provide the legal conclusions that certain government interests, such as "maintaining an attractive community," are legitimate or substantial. [*Id.* at p. 8] Those conclusions might be helpful to the Court, but they do not assist the jury in deciding questions

of fact: here, whether LFUCG has identified valid interests justifying the ordinance, and whether the ordinance is sufficiently tailored to the articulated interests.

Based on the foregoing, the undersigned will not consider any of Dr. Kelly's testimony or opinions providing legal conclusions.  Specifically, references to LFUCG's rational basis or substantial or compelling interests will be excluded from his testimony, as will any references to caselaw.  [*See* Record No. 56, pp. 76, 78, 84-89, 120-21, 179-80.] The following opinions in Dr. Kelly's report also will be excluded from consideration:

a.     "For reasons explained in this report, I believe that the Urban County Council, the legislative body, had multiple rational bases for the adoption of the ordinance, as expressed in the statement of intent at the beginning of the ordinance; that the LFUCG has a substantial governmental interest in those bases or purposes, and that the ordinance is no broader than necessary to fulfill those purposes."  [Record No. 64-1, p. 1]

b.     "This report will show that LFUCG's sign ordinance is a legitimate exercise of its zoning and police power, that LFUCG has identified several substantial interests underlying the ordinance, that those interests are rationally related to and directly advanced by the ordinance, and that the ordinance's regulations at issue in this case are no more restrictive than necessary to accomplish LFUCG's purposes."  [*Id.* at p. 1]

c.     "LFUCG's sign ordinance directly advances the government interest in way-finding by allowing signs of different sizes and types based on land-use, while at the same time controlling and appropriately limiting visual clutter."  [*Id.* at pp. 6-7]

d.     "As both the Kentucky high court and the U.S. Supreme Court have recognized, there is a legitimate and substantial governmental interest in maintaining an attractive community.   LFUCG's sign ordinance directly advances the government interest in

- 10 -

community aesthetics by controlling the size and lighting of signs for different contexts by allowing signs of different sizes and types based on land-use, thus limiting the kinds of conflicts that occur when a larger sign intrudes on a residential neighborhood, and, at the same time, controlling and appropriately limiting visual clutter." [*Id.* at p. 8]

e.      "With these considerations in mind, it is clear that LFUCG had a rational basis in regulating signs for their impact on traffic safety. LFUCG's sign ordinance directly advances the substantial interest in traffic safety by controlling the placement of different sizes and types of signs based on traffic patterns, traffic speeds and land uses in different zones. LFUCG's sign ordinance also advances the government interests in limiting visual clutter and driver distraction while still allowing signs as a form of communication." [*Id.* at p. 12]

f.      "LFUCG's sign ordinance substantially advances the government interest in continuing to create an environment that is attractive and interesting to tourists, significantly limiting very large signs, moving signs, video signs and other intrusive signs, while continuing to allow signs that are useful in way-finding." [*Id.* at p. 15]

g.      "In short, there are multiple rational bases for the adoption of the sign ordinance and the ordinance directly advances LFUCG's bases." [*Id.* at p. 20]

h.      "The question is whether there is a substantial basis for this ordinance in LFUCG – as I hope that this report illustrates, there is indeed. As discussed here, there is a substantial basis for the sign ordinance, the sign ordinance is rationally related to and directly advances LFUCG's stated interests, and the sign ordinance is not more restrictive than necessary to advance those interests." [*Id.*]

## B.  Dr. Kelly's Report is Reliable.

Lamar also contends that Dr. Kelly's report and testimony should be excluded in its entirety because it "rest[s] on fundamentally flawed and unreliable methodology."  [Record No. 64, p. 6] Notably, the plaintiff does not challenge Dr. Kelly's qualifications.  Instead, Lamar claims that Dr. Kelly's methods were inadequate because he failed to consider literature that opposed his position and he improperly relied on other expert's conclusions.  [*Id.* at pp. 11-14] LFUCG contends in response that Dr. Kelly was entitled to rely on other expert opinions in drafting his report.  [Record No. 74, p. 8] Additionally, the defendant argues that the plaintiff's challenges to the adequacy of Dr. Kelly's literature review go to the weight of his testimony and do not constitute grounds for exclusion.  [*Id.* at pp. 13-14]

An expert witness's testimony is reliable under Rule 702 if it is "based upon sufficient facts or data; . . . is the product of reliable principles and methods; and . . . [the expert has] reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702(b)-(d). When evaluating the reliability of expert testimony, courts in the Sixth Circuit consider "whether an expert's theory has been tested, is the subject of peer review and publication, has a permissible error rate, follows established standards, and receives 'general acceptance' within a 'relevant scientific community.'"  *United States v. Mallory*, 902 F.3d 584, 592-93 (6th Cir. 2018) (citing *Daubert*, 509 U.S. at 593-94).  "The questions of what factors to apply and what conclusion to draw about an expert's reliability are entrusted to the district court's discretion."  *Id.* at 593 (citing *Kumho*, 526 U.S. at 152-53).

The undersigned concludes that the literature review contained in Dr. Kelly's report is reliable.  As LFUCG correctly asserts, Dr. Kelly's methodology does not need to be perfect to be reliable under Rule 702.  [Record No. 74, p. 7 (citing *Best v. Lowe's Home Ctrs., Inc.*, 563

F.3d 171, 181 (6th Cir. 2009))]  And the expert's explanation of his methodology in conducting the literature review demonstrates that his approach in researching and preparing his report was sufficiently reliable. *See In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 530 (6th Cir. 2008) ("Where an expert's testimony amounts to 'mere guess or speculation,' the court should exclude his testimony, but where the opinion has a factual basis, it should not be excluded [because] it is up to opposing counsel to inquire into the expert's factual basis.").

The plaintiff's argument that Dr. Kelly refused to consider studies that did not support his conclusion is unavailing, as the witness expressly stated that he considered opposing studies in his deposition.  [*See* Record No. 56, pp. 152-56.]  The fact that he did not include specific opposing studies in his report, including the study commissioned by the Federal Highway Administration that Lamar mentions, is not a basis for exclusion.  [*See* Record No. 64, pp. 12-13.]  Moreover, Dr. Kelly's report is not unreliable merely because he did not review all the literature pertaining to the topics discussed in his report.  *See In re C. R. Bard, Inc., Pelvic Repair Sys. Prods. Liab. Litig.*, No. 2187, 2018 WL 4220616, at *5 (S.D. W. Va. Sept. 5, 2018) (noting that "[n]othing in *Daubert* . . .  requires an expert to consider every single article on a topic.").

And none of the studies cited by Dr. Kelly renders his report unreliable.  LFUCG correctly notes that the witness may rely on Jerry Wachtel's study in support of his opinions.  [*See* Record No. 74, p. 8 (citing *Mod. Holdings, LLC v. Corning, Inc.*, No. 5:13-CV-00405-GFVT, 2022 WL 2910005, at *6 (E.D. Ky. July 22, 2022) ("[I]t is firmly established under Rule 703 that an expert's testimony may be formed using the conclusions and opinions of other experts.")).]  His inclusion of an Israeli study presenting differing circumstances and his misstatement regarding the length of time that a driver may safely glance away from the road

does not lead to the conclusion that his report is inadmissible.  [*See* Record No. 64, pp. 14-15.]  Instead, the concerns cited by the plaintiff reflect the weight of the evidence, which can be thoroughly evaluated by the jury and challenged on cross-examination.  *See Andler v. Clear Channel Broad., Inc.*, 670 F.3d 717, 729 (6th Cir. 2012) (reversing trial court decision to "'exclude expert testimony 'merely because the factual bases for an expert's opinion [were] weak,'" and noting that jury 'could have weighed [the expert's] opinion, informed by [the defendant's] vigorous cross examination").

In summary, the motion to exclude the opinions and testimony of Dr. Kelly will be granted, in part, and denied, in part.  The above-mentioned opinions and citations will not be considered by the Court in ruling on the parties' cross motions for summary judgment.

### III.  The Motions for Summary Judgment

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) (citing Fed. R. Civ. P. 56(c)).  To meet that standard, a movant must show that the nonmoving party has failed to produce evidence to support an essential element of his claim.  *See Minadeo v. ICI Paints*, 398 F.3d 751, 761 (6th Cir. 2005) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989) (citations omitted)).  Once the moving party has satisfied this burden, "the opposing party must set forth specific facts showing that there is a genuine issue for trial."  *McLaughlin v. Fifth Third Bank, Inc.*, 772 F. App'x 300, 302 (6th Cir. 2019) (citing Fed. R. Civ. P. 56(e)).

A court considering a motion for summary judgment must construe the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio*

*Corp.*, 475 U.S. 574, 587 (1986). It may not weigh the evidence or make credibility determinations but must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see also Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015). However, in reviewing cross-motions for summary judgment, the undersigned must "evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Taft Broad. Co. v. United States*, 929 F.2d 240, 248 (6th Cir. 1991) (citation omitted).

## A. Standing

Before deciding whether the ordinance "targets speech based on its communicative content," the Court must address whether Lamar has standing to sue. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155 (2015). "The Constitution gives federal courts the power to adjudicate only genuine 'Cases' and 'Controversies.'" *California v. Texas*, 141 S. Ct. 2104, 2113 (2021) (citing U.S. Const. Art. III, § 2). "For a dispute to qualify as an Article III 'case' that a federal court may resolve, the plaintiff who brings the dispute to the court must have 'standing.'" *CHKRS, LLC v. City of Dublin*, 984 F.3d 483, 488 (6th Cir. 2021) (citation omitted). A plaintiff has standing to maintain an action if he can demonstrate that he: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).

The party invoking federal jurisdiction bears the burden of establishing the elements of standing. "Since [the three elements of standing] are not mere pleading requirements but rather

- 15 -

an indispensable part of the plaintiff's case, each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Accordingly, at the summary judgment stage, the plaintiff must "set forth specific facts demonstrating his standing." *Ward v. Nat'l Patient Acct. Servs. Sols., Inc.,* 9 F.4th 357, 361 (6th Cir. 2021).

Standing requirements are somewhat relaxed in the context of First Amendment challenges. Under the overbreadth doctrine, a plaintiff may challenge a statute "not because [his] own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others before the court to refrain from constitutionally protected speech or expression." *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988). But while plaintiffs are given "broader latitude" to establish standing in First Amendment cases, they must nonetheless "allege an injury in fact under each provision of the ordinance that [they] seek[] to challenge." *Outdoor One Commc'ns, LLC v. Charter Twp. of Genoa, Mich.*, No. 2: 20-CV-12459, 2021 WL 4480165, at *4 (E.D. Mich. Sept. 30, 2021). The "critical inquiry is whether the plaintiff can allege an injury arising from the specific rule being challenged, rather than an entirely separate rule that happens to appear in the same section of the municipal code." *Prime Media, Inc. v. City of Brentwood*, 485 F.3d 343, 351 (6th Cir. 2007).

Before reaching the merits of the Lamar's claims, the Court considers if the plaintiff has asserted facts demonstrating that it suffered an "independent injury" from each challenged provision, and whether its injury could be redressed by a decision in its favor. *Id.* at 348.

### 1.  Standing Regarding Counts 1 & 3—Restrictions on EMDS Signs

Lamar claims that the ordinance's restrictions on EMDS signs violate the First Amendment.  It alleges in Count 1 that by permitting digital signs in certain zones, LFUCG has drawn "content-based and speaker-based restrictions" that fail to satisfy strict scrutiny. [Record No. 1, p. 18] Alternatively, it contends in Count 3 that the provisions applicable to EMDS signs contained in Sections 17-7(g)(7), 17-7(h)(7), and 17-7(i)(2) constitute content-neutral restrictions that fail under intermediate scrutiny.  [*Id.* at p. 31]

In *Prime Media, Inc. v. City of Brentwood*, 485 F.3d at 354, the Sixth Circuit discussed the requirements for establishing standing in the context of challenging a sign ordinance.  The court found that, because the plaintiff's permit applications were denied for failure to comply with the ordinance's size and height requirements, it lacked standing to "litigate other independent provisions of the ordinance without a separate showing of an actual injury under those provisions."  *Id.* at 350.  Thus, the plaintiff could not challenge provisions of the city's sign ordinance that regulated "types of signs entirely unrelated to its line of business" because it failed to allege facts demonstrating that it was "injured or threatened with injury" by those provisions.  *Id.* at 353.

Lamar has asserted an independent injury in fact resulting from the provisions of the ordinance regulating EMDS signs.  Record evidence indicates that LFUCG denied Lamar's applications for permits because the plaintiff requested to display EMDS signs.  [*See* Record Nos. 1-2, pp. 2-4 (listing plaintiff's project description as "Disapproved Digital Billboard"), 53, pp. 23-24 (noting that "LFUCG does not allow advertising signs to be EMDS"), 55, pp. 18-19 (affirming that Lamar's signs were denied "because digital billboards are not allowed").].  As such, Lamar can trace its injury only to the provisions of the ordinance

regulating EMDS signs.  *See Outdoor One Commc'ns, LLC*, 2021 WL 4480165, at *5 (finding that plaintiff lacked standing to challenge content-based restrictions because its "injury is traceable only to the provisions [the defendant] cited in denying it a permit").

The plaintiff therefore lacks standing to challenge Section 17-3(b)'s distinction between "advertising," or off-premises, and "business," or on-premises, signs, as described in Count 1 of its Complaint.  *Prime Media*, 485 F.3d at 350.  The plaintiff's applications were denied because its billboards were digital, not because they met or failed to meet the definition of an advertising or business sign.  Additionally, the provisions of the ordinance regulating EMDS signs does not distinguish between advertising and business signs in ways that could have contributed to the plaintiff's injury.

However, Lamar has demonstrated that it was injured by the exemptions for EMDS signs contained in Sections 17-7(g)(7), 17-7(h)(7), and 17-7(i)(2).  LFUCG contends that Lamar cannot establish that it was injured by those three provisions because the plaintiff failed to demonstrate that its proposed signs otherwise complied with the exemption's requirements. Namely, the defendant claims that Lamar's signs did not comply with the provisions' size, location, and functional limitations.  [*See* Record No. 1-1, pp. 18, 20, 21 (permitting EMDS signs "for an indoor or outdoor stadium or arena . . . used to notify the public of events to be held in the stadium or arena," "for civic centers . . . [which] shall not exceed eighty (80) square feet per sign," and "for civic centers . . . used primarily only to notify the public of special events in the civic center or to provide public service information . . . [two of which are] not exceeding two hundred square feet . . . [and] two additional signs . . . not exceeding fifty (50) square feet each").]  The plaintiff counters that its applications were denied for being digital, and "not because they were too big, tall, or anything else."  [Record No. 71, p. 13] Accordingly,

Lamar concludes that, if not for the digital character of its signs, its applications would be "fully legal and permitted." [*Id.*]

Lamar has sufficiently alleged that it was independently injured by Sections 17-7(g)(7), 17-7(h)(7), and 17-7(i)(2). The defendant correctly notes that record evidence indicates that Lamar's signs exceeded relevant size requirements. [*See* Record No. 55, pp. 13-14 (noting that all of Lamar's proposed signs were "generally . . . all the same size, about 360 square feet").] However, as the plaintiff explains, LFUCG stated that it denied Lamar's applications because its proposed signs were digital, not because Lamar failed to comply with any size requirements. As such, the plaintiff has established that its injury—the denial of its permits— is "fairly traceable" to the digital character of its signs, regardless of its compliance with the exemptions' other requirements. *Spokeo*, 578 U.S. at 338.

Even if Lamar has established that it was injured by the three exceptions to the ban on EMDS signs, the plaintiff has not demonstrated that any injury it suffered could be redressed by finding the provisions it challenges unconstitutional. "Courts in the Sixth Circuit have explained that the severability of allegedly unconstitutional sign ordinance provisions may establish that a plaintiff's claimed injury is not redressable." *Outdoor One Commc'ns, LLC*, 2021 WL 4480165, at *8 (citation omitted).

The Sixth Circuit explored the intersection of redressability and severability in *Midwest Media Property, LLC v. Symmes Township, Ohio*, in which it found that a plaintiff lacked standing to challenge a sign ordinance's off-site advertising ban because the plaintiff's injury would not be redressed if the ban was struck down. 503 F.3d 456, 464-66 (6th Cir. 2007). The plaintiff's sign applications were denied because the proposed signs exceeded size and height limitations, which the court found were constitutional and could "comfortably stand on their

- 19 -

own" if the challenged provisions were severed from the ordinance. *Id.* at 461 (citing *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 818-21 (6th Cir. 2005)). Because the ordinance's size and height requirements independently barred the plaintiff from displaying its signs, the Court found that the plaintiff had not demonstrated that its injury would be redressed by striking down other provisions in the law. *Id.* at 464.

By contrast, in *International Outdoor, Inc. v. City of Troy, Michigan*, the Sixth Circuit determined that a plaintiff had standing to challenge a variance provision in the City's sign ordinance—although the plaintiff's signs exceeded size, height, and setback requirements— because the variance provision could not be severed from the ordinance. 974 F.3d 690, 702 (6th Cir. 2020). It reasoned that the variance provision was "inextricably linked to [the remaining provisions of the law] by providing a way of relaxing the very restrictions imposed by the Sign Ordinance" and so could not be removed from the law if deemed unconstitutional. *Id.* As the court explained, because the variance provision would "allow [the plaintiff] to obtain redress" by way of relaxing the size and height restrictions, "it would amount to circular logic to say that International Outdoor lacks standing to challenge the ordinance because it challenges the very provision that gives it standing to challenge the ordinance." *Id.* at 703.

Accordingly, Lamar's standing to challenge Sections 17-7(g)(7), 17-7(h)(7), and 17-7(i)(2) depends on whether those provisions may be severed from the ordinance. If they can be severed, and if the resulting ban on EMDS signs is constitutional, the plaintiff's claim in Counts 1 and 3 fail for lack of standing. The Court considers each question in turn.

### a. The Challenged Provisions are Severable.

Courts generally refrain from "nullify[ing] more of a legislature's work than is necessary . . . [because] it frustrates the intent of the elected representatives of the people."

- 20 -

*Ayotte v. Planned Parenthood*, 546 U.S. 320, 329 (2006).  The Sixth Circuit has established that a court may not invalidate a statutory provision that is "(1) 'constitutionally valid,' or otherwise in compliance with federal law, (2) capable of 'functioning independently' from the severed provision, and (3) operate[s] in a manner consistent with the law-making body's objectives in enacting the statute." *Cam I, Inc. v. Louisville/Jefferson Cnty. Metro Gov't*, 460 F.3d 717, 720-21 (6th Cir. 2006) (citing *United States v. Booker*, 543 U.S. 220, 258-59 (2005)).

"Severability of a local ordinance is a question of state law." *City of Lakewood v. Plain Dealer Publ'g Co.*, 486 U.S. 750, 772 (1988).  Kentucky's general severability statute provides that an unconstitutional provision must be severed from a statute, leaving the "remaining parts . . . in force," unless "the statute provides otherwise, . . . the remaining parts are so essentially and inseparably connected with and dependent upon the unconstitutional part that it is apparent that the General Assembly would not have enacted the remaining parts without the unconstitutional part, or unless the remaining parts, standing alone . . . [are] incapable of being executed in accordance with the intent of the General Assembly."  KRS § 446.090.

Kentucky courts have applied the state's general severability statute to local ordinances. *Louisville/Jefferson Cnty. Metro Gov't v. Metro Louisville Hosp. Coal., Inc.*, 297 S.W.3d 42, 45 (Ky. App. Ct. 2009).   Additionally, LFUCG's Code of Ordinances contains a similar severability provision.  *See* LFUCG Code of Ordinances, § 1-5 (providing that "if any phrase, clause, sentence, paragraph or section of this Code shall be declared unconstitutional . . . such unconstitutionality shall not affect any of the remaining phrases, clauses, sentences, paragraphs and sections of this Code.").

Lamar has failed to demonstrate that the ordinance could not remain in force absent the challenged exemptions for EMDS signs.  The plaintiff argues that the lawful provisions of the

regulation are "essentially and inseparably connected with and dependent upon" the allegedly unconstitutional provisions, so that the law would "look like swiss cheese" if any offending provisions were severed. [Record No. 71, p. 15] But the plaintiff's summary conclusions, without demonstrating how the ordinance could not be enforced if the provisions permitting EMDS signs were severed, are insufficient to rebut the presumption of severability. *See Plain Dealer Publ'g Co.*, 794 F.2d at 1147 ("[A] provision is presumed severable if what remains after severance is fully operative as a law.").

Moreover, the plaintiff has not provided any evidence to suggest that the LFUCG Council would not have enacted the ordinance absent the challenged provisions. *See Byrd v. Tenn. Wine & Spirits Retailers Ass'n*, 883 F.3d 608, 626 (6th Cir. 2018) ("We also must remember that 'the touchstone for any decision about remedy is legislative intent, for a court cannot 'use its remedial powers to circumvent the intent of the legislature.'") (citation omitted). To the contrary, the defendant has provided evidence suggesting that the Council carved out narrow exceptions to its ban on EMDS signs for specific purposes—namely, to attract a minor league baseball team to the Lexington area and to revitalize the downtown area. [*See* Record Nos. 65-3, 65-6.] While the limited exceptions helped LFUCG achieve specific goals, there is no indication that the Council would have foregone passing any sign restrictions absent those provisions. Because the ordinance is enforceable absent the limited allowance of EMDS signs in Sections 17-7(g)(7), 17-7(h)(7), and 17-7(i)(2), those provisions may be severed under state law.

### b. The Ban on EMDS Signs is Constitutional.

After removing the provisions permitting EMDS signs challenged by the plaintiff, the remaining provisions of the ordinance amount to a ban on EMDS signs. Lamar contends that,

if not for the challenged provisions, its digital billboards "would have been fully legal under [Section] 17-7(g)(7), which allows signs that are 'internally illuminated or directly illuminated.'" [Record No. 71, p. 11] But Lamar itself admits that its billboards are considered EMDS signs under the ordinance. [*See* Record No. 63, p. 6.] It therefore cannot claim that its signs would be permitted under provisions regulating "internally illuminated" or "directly illuminated" signs, which fall under separate categories.

Moreover, LFUCG correctly asserts that Lamar "has it exactly backwards" by claiming that its signs would be permitted absent the challenged provisions. [Record No. 78, p. 4] Without the exceptions to the ban on EMDS signs in Sections 17-7(g)(7), (h)(7), and (i)(2), the ordinance does not *permit* all EMDS signs, but rather *prohibits* them. [*See* Record No. 1-1, p. 12, Section 17-7 ("Any sign not specifically permitted shall be deemed as prohibited.").] As such, if the narrow exceptions that the plaintiff challenges in Counts 1 and 3 are removed, the plaintiff's applications would be denied under Section 17-7's general ban, not permitted under the plaintiff's imagined regulatory free-for-all.

The Court next considers whether the ordinance's resulting ban on EMDS signs violates the First Amendment. As applied to the states through the Fourteenth Amendment, the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Courts determining whether a regulation of expression violates the First Amendment must first determine if the regulation is content-based or content-neutral. *Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015). A content-based regulation "draws distinctions based on the message a speaker conveys," and is presumed to be unconstitutional unless the government can establish that the regulation is "narrowly tailored to serve compelling state interests." *Id.* By contrast, a law that places restrictions on the time, place,

and manner of expression will be upheld if it is "justified without reference to the content of the regulated speech . . . [is] narrowly tailored . . . to serve a significant governmental interest, and [it] leave[s] open ample alternative channels for communication of the information." *Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814, 818 (6th Cir. 2005) (citing *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984)).[2]

In *Reed*, the Supreme Court held that a Sign Code that imposed distinct regulations on 23 different categories of signs "target[ed] speech based on its communicative content" and was therefore subject to strict scrutiny. 576 U.S. at 164. The Court reasoned that the town's Sign Code was content based because "an enforcement officer would have to read the sign to determine what provisions of the Sign Code applied to it." *Id.*

However, the Court recently clarified that *Reed*'s "need to read" rule was "too extreme an interpretation of this Court's precedent" in *City of Austin, Texas*, 142 S. Ct. at 1471. In *City of Austin*, it held that a regulation that banned off-premises digital billboards while permitting on-premises digital billboards was not content based merely because applying the regulation "require[d] some evaluation of the speech." 142 S. Ct. at 1473. Instead, because the regulation "require[d] an examination of speech only in service of drawing neutral, location-based lines"

---

[2]      The parties note that the Court could evaluate any content-neutral provisions regulating commercial speech using the form of intermediate scrutiny articulated in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980). However, the Sixth Circuit has recognized that the *Central Hudson* standard "is not appropriately applied to content-neutral ordinances that regulate both commercial and non-commercial speech." *Bench Billboard Co. v. City of Covington, Ky.*, 465 F. App'x. 395, 405 (6th Cir. 2012). The circuit court has also recognized that the choice of which standard to apply "makes little difference" because the two standards "impose similarly demanding levels of 'intermediate scrutiny.'" *Hucul Advert., LLC v. Charter Twp. of Gaines*, 748 F.3d 273, 276 (6th Cir. 2014). Because the ordinance regulates both commercial and noncommercial speech, the Court will use the time, place, and manner test in evaluating any content-neutral restrictions contained in the ordinance.

- 24 -

and was "agnostic as to content," it was content neutral.  *Id.*  The Court determined that the regulation should be evaluated using intermediate scrutiny, unless "there [was] evidence that an impermissible purpose or justification underpin[ned] a facially content-neutral restriction." *Id.* at 1475.

The ordinance's ban of EMDS signs is a valid content-neutral regulation of speech. The section of the ordinance defining EMDS signs categorizes signs "by certain design features of the sign itself," rather than by the message expressed in the sign.  [Record No. 1-1, p. 6, Section 17-3(d)] And as just explained, absent the three exemptions for EMDS signs in Sections 17-7(g)(7), 17-7(h)(7), and 17-7(i)(2), the ordinance imposes a total ban on EMDS signs that does not draw distinctions based upon the sign's communicative content.  Because the ban on EMDS signs applies regardless of the "topic discussed or message expressed," the definition is content neutral and will be evaluated under intermediate scrutiny.

Under the first prong of intermediate scrutiny. LFUCG has demonstrated that its regulation furthers the substantial government interests of promoting traffic safety and preserving aesthetics.  Those interests are reflected in the ordinance's statement of purpose and in statements from the Urban County Council.  [*See* Record No. 1-1, Section 17-1 (stating that LFUCG sought to "provide sign standards and restrictions" to, among other things, promote "business and industrial activities while at the same time . . . [preserving] the overall aesthetics of the community . . . [and] provide[] for improved public safety by minimizing the undue distraction of the motoring public."), Record No. 65-5 (finding that permitting digital signs near the civic center would enhance civic center operations while minimizing any resulting "adverse aesthetic impact" from increased signage), 65-6 (recognizing that

permitting EMDS signs near a stadium or arena would provide "appropriate information to the public" while "assur[ing] a limited number of signs of this type would be allowed").]

Courts have repeatedly held that promoting traffic safety and preserving aesthetics are substantial interests for purposes of applying intermediate scrutiny. *See Prime Media, Inc.*, 398 F.3d at 819 (holding that city's sign regulations satisfied first prong of intermediate scrutiny because they "advance legitimate governmental interests—aesthetics and traffic safety"); *PHN Motors, LLC v. Medina Twp.*, 498 F. App'x 540, 545 (6th Cir. 2012) ("aesthetic concerns have been deemed substantial interests *as a matter of law*, when used to justify regulations restricting signage"); *see also Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507-08 (1981) ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial governmental goals.").

Lamar does not dispute that aesthetics and traffic safety are substantial government interests, but instead challenges the validity of LFUCG's claims. The plaintiff states that the defendant provided no evidence that it "has ever received complaints or had problems of any kind regarding any type of billboard, digital or otherwise." [Record No. 63, p. 19] However, as the defendant correctly asserts, the government is not required to submit empirical evidence in support of its alleged interests, nor does it need to "try to prove that [its] aesthetic [or safety] judgments are right." [Record No. 73, p. 19 (quoting *Leibundguth Storage & Van Serv., Inc. v. Vill. of Downers Grove*, 939 F.3d 859, 862 (7th Cir. 2019))]

Moreover, the defendant provides sufficient evidence in support of its claimed interests. Specifically, LFUCG submitted statements from Urban County Council members explaining that they amended the ordinance due to concerns about safety and preserving the character of

- 26 -

the Lexington area.  [*See, e.g.,* Record Nos. 65-3, 65-4 (noting that the general public complains about an excess of temporary signs because they "can be distracting to drivers"), 65-5 (explaining that permitting EMDS signs near civic center would "expedite traffic flow"), 65-6 (permitting EMDS signs near a stadium or arena to "provide[] appropriate information to the public [while] assur[ing] a limited number of signs of this type would be allowed").]  Not to mention, the ordinance's statement of purpose constitutes sufficient evidence of LFUCG's substantial interests.  [Record No. 1-1, p. 2] *See Norton Outdoor Advert., Inc. v. Vill. of St. Bernard*, No. 1:20-CV-350, 2022 WL 2176339, at *4 (S.D. Ohio June 16, 2022) ("[T]he Village's codified statements [contained in regulation's statement of intent] are evidence of 'substantial governmental interests' as a matter of law.").

A complete ban of EMDS signs is narrowly tailored to achieve LFUCG's stated interests.  The Supreme Court has recognized that a complete ban on a form of expression is not overinclusive if the ban is "directly related to the evil sought to be averted."  *Prime Media*, 398 F.3d at 820 (discussing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 808 (1984) (finding that complete ban on posting signs on telephone poles was narrowly tailored to government's substantial interest in eliminating "visual clutter and blight," and that "[b]y banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy")).  And as the Court recognized in *Metromedia, Inc. v. City of San Diego*, if a city "has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them."  453 U.S. 490, 508 (1981).

Lamar claims that the defendant presented insufficient evidence that its ordinance was narrowly tailored, but "intermediate scrutiny has 'never required' a municipality to

'demonstrate not merely by appeal to common sense, but also with empirical data, that its ordinance will successfully' achieve the desired end."  *Reagan Nat'l Advert. of Austin, Inc. v. City of Austin, Tex.*, 64 F.4th 287, 297-98 (5th Cir. 2023) (citing *City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 439 (2002)).  Additionally, Lamar's suggestion that LFUCG could have taken less restrictive measures to accomplish its goals, such as by imposing brightness restrictions on EMDS signs, is unavailing.  Intermediate scrutiny requires a fit that is "not necessarily perfect, but reasonable," and the government's regulation need not be "the single best disposition" to be upheld.  *Spring House Com., LLC v. City of Richmond, Ky.*, No. 5:21-CV-149, 2022 WL 17406310, at *3 (E.D. Ky. Dec. 2, 2022) (citations omitted).

Finally, the ordinance leaves open alternative channels for communication.  Lamar claims that because the company is forced to use static billboards under the ordinance, it is limited from displaying the amount and variety of content that it could present on a digital sign.  [Record No. 63, p. 22] But LFUCG is not required to guarantee the most profitable method of communication to withstand intermediate scrutiny.  [Record No. 65, p. 22]  While "digitization would enable [Lamar] to make more effective use of [its] billboard space," the inability to "maximize the use of [its] space" does not wholly prevent the company from communicating because "[Lamar] can use [static-faced billboards] to communicate whatever messages [it] choose[s]."  *City of Austin*, 142 S. Ct. at 1479 (Breyer, J., concurring).

In summary, the undersigned concludes that the ordinance's ban on EMDS signs is a constitutional restriction that is not inextricably intertwined with the three exceptions to that ban that are challenged by Lamar.  The plaintiff cannot show that its injury would be redressed by striking down the challenged provisions listed in Counts 1 and 3.  The defendant, therefore, is entitled to summary judgment on those claims.

- 28 -

## 2.  Standing Regarding Count 2—Other Content-Based Provisions

Lamar's second claim against LFUCG challenges the entirety of the ordinance. [Record No. 1, pp. 21-30] It contends that various provisions in the ordinance contain "unconstitutional content-based restrictions of free speech that fail to meet strict scrutiny," citing Sections 17-2, 17-3(a), (b), 17-4(c), 17-6, 17-7, and 17-14.  LFUCG is entitled to summary judgment on Count 2 because Lamar has not demonstrated that it was independently injured by provisions listed in Count 2 of its Complaint, or that its injuries could be redressed by a favorable decision from this Court.

The plaintiff lacks standing to challenge the provisions of the ordinance providing definitions, such as Section 17-3(a)'s definition of "sign."  [See Record No. 1-1, p. 3] As mentioned, Lamar's injury stems from the provisions of the ordinance regulating *digital* signs, not signs generally.  In other words, because the billboards that the plaintiff sought to digitize undoubtedly fell within the ordinance's definition of "sign," it cannot show that it was injured by that definition.  *See Norton Outdoor Advert., Inc.*, 2022 WL 2176339, at *4 (S.D. Ohio June 16, 2022) (finding that plaintiff lacked standing to challenge ordinance's definition of a "sign" because its proposed billboards "clearly fall within the definition of a 'sign'").

Similarly, Lamar lacks standing to challenge Section 17-3(b)'s list of "Basic Sign Types By Function" and the provisions in Sections 17-6 and 17-7 that incorporate those definitions.  [*See* Record No. 1-1, pp. 3-4, 10-25.]  The plaintiff has not presented any facts demonstrating that those allegedly content-based definitions were the reason that its applications were denied.  Indeed, like in *Prime Media*, many of the definitions listed in the Complaint are "overwhelmingly 'unrelated to its line of business'" and could not possibly have led to the denial of Lamar's applications.  485 F.3d at 353.

Lamar also fails to demonstrate that it has standing to challenge the allegedly content-based exemptions in the ordinance.  [*See* Record No. 1, pp. 23-26.]  The plaintiff argues that Section 17-2(a), which exempts select categories of signs from any regulation, and Section 17-4, which exempts certain signs from the permitting process, led to its injury because Lamar was not given the same favorable treatment as parties whose signs would qualify for an exemption.  [Record No. 71, p. 11] LFUCG counters that the plaintiff's injury would not be redressed if those exemptions were struck down, because Lamar's signs are subject to "height, width, [and] similar limitations which [the plaintiff] could not meet."  [Record No. 78, pp. 4-5] The Court agrees with the defendant.

Unlike the variance provision in *International Outdoor, Inc.*, the exemptions contained in Sections 17-2 and 17-4 are not "inextricably linked" to the remainder of the ordinance.  974 F.3d at 702.  Instead, like with the challenged provisions in Counts 1 and 3, those exemptions can be severed from the ordinance under state law.  The ordinance lists exempted sign categories as distinct provisions within the regulation.  [*See* Record No. 1-1, pp. 2-3, 8.]  And Lamar has not presented evidence suggesting that LFUCG would not have enacted the ordinance without the listed exemptions, or that the law could not be enforced without them.  As such, the undersigned concludes that, to the extent the exemptions in Sections 17-2 and 17-4 are unconstitutional, they may be severed from the ordinance.

The ordinance would "comfortably stand on [its] own" absent the challenged exemptions in Count 2.  *Midwest Media*, 503 F.3d at 461.  Even if all the allegedly content-based exemptions in Sections 17-2 and 17-4 were removed from the ordinance, the plaintiff's applications could still be properly denied under the ban on EMDS signs.  Because the plaintiff has failed to demonstrate that its injury would not be redressed by removing any content-based

- 30 -

exemptions from the ordinance, the defendant's motion for summary judgment as to Count 2 will be granted.

### 3.  Standing Regarding Count 4—Prior Restraint

Lamar contends in Count 4 that the ordinance's permitting scheme amounts to an unconstitutional prior restraint.  [Record No. 1, pp. 33-37] The plaintiff claims that the permitting process is unconstitutional because officials lack "clear and objective guidance" in evaluating applications and because certain categories of signs are exempted from the permitting process based on their content, including Political Signs, Nameplates, and Government Signs.  [Record Nos. 1, p. 34, 63, pp. 22-25] But like with the above claims, the plaintiff lacks standing to challenge the ordinance as an unconstitutional prior restraint.

"A prior restraint is any law 'forbidding certain communications when issued in advance of the time that such communications are to occur.'"  *McGlone v. Bell*, 681 F.3d 718, 733 (6th Cir. 2012) (quoting *Alexander v. United States*, 509 U.S. 544, 550 (1993)).  The Sixth Circuit has recognized that "[t]he requirement of an actual injury is not obviated by a prior restraint claim." *Phillips v. DeWine*, 841 F.3d 405, 416 (6th Cir. 2016) (cleaned up).  The Sixth Circuit discussed the requirements for establishing standing to assert a prior restraint claim in *Outdoor One Commc'ns, LLC v. Charter Township of Canton*, No. 21-1323, 2021 WL 5974157 (6th Cir. Dec. 16, 2021).  The plaintiff's application to display a digital billboard that covered 360 square feet and measured 30 feet high was denied because the sign "[e]xceed[ed] the] size and height allowed" under the Township's sign ordinance.  *Id.* at *1.  The plaintiff sued, claiming that the ordinance was an unconstitutional prior restraint because it imposed a permit requirement but exempted some signs from that requirement, like political signs.  *Id.* at *1.

The court found that the plaintiff lacked standing to bring the prior restraint claim because it was not independently injured by the ordinance's permitting requirement. *Id.* at *4. It explained that because the plaintiff's permit applications were denied solely because its proposed signs were "too big," it had not demonstrated that its "speech was altered or deterred by any prior restraint or that it was impeded by [the permitting] provisions of Canton's ordinance." *Id.*; *see also Elevation Outdoor Advert., LLC, v. City of Pigeon Forge, Tenn.*, No. 3:22-CV-105, 2023 WL 2058651, at*4 (E.D. Tenn. Feb. 16, 2023) (finding no standing for prior restraint claim because "even if the provisions of defendant's ordinances imposing time limits on the decision-making process were held unconstitutional, plaintiff's signs would still be denied due to the provisions imposing size and height restrictions").

Similarly, Lamar's injury will not be redressed by striking down any allegedly offensive portions of the permitting scheme. Lamar's applications were denied because it proposed displaying EMDS signs. [*See* Record No. 1-1, 55, pp. 13-14.] And as was previously determined, the ordinance's ban on EMDS signs is a constitutional regulation that survives independently from any alleged unconstitutional provisions regulating the permitting process. As such, Lamar's permits would have been denied on constitutionally valid grounds regardless of whether the Court struck down the provisions about which the plaintiff complains in Count 4.

More specifically, Lamar claims that the ordinance vests "unfettered discretion" in officials determining whether to grant its applications for a permit, but it has not demonstrated how that discretion led to the denial of its applications or caused it to self-censor. [Record No. 1, p. 34] *See Covenant Media of N.C., LLC v. City of Monroe, N.C.*, 285 F. App'x 30, 37 (4th Cir. 2008) (finding no standing to challenge permitting process as unconstitutional prior

restraint because "[n]o change in the permit procedures would result in the approval of their applications to erect oversized billboards"). Specifically, the record demonstrates that LFUCG denied Lamar's applications 20 days after they were filed, and Lamar has not shown how that 20-day delay led to its injury. [Record No. 1-2, p. 4] *See Elevation Outdoor Advert., LLC*, 2023 WL 2058651, at *5 (finding no standing when the "plaintiff has not shown how being required to wait 48 days on defendant's permitting decision affected its speech or otherwise injured plaintiff").

Lamar also did not show how the existence of any content-based exemptions to the permitting process led to its injury. The plaintiff has not alleged that it intended to display signs that would fall under one of Section 17-4(c)'s listed exemptions. [Record No. 1-1, p. 8] Nor has it established that the exemptions could not be severed from Section 17-4, in which case officials would decide whether to grant a permit considering content-neutral factors, including the "site plan," "type of construction, method of illumination, dimensions, . . . [and] method of mounting." [Record No. 1-1, p. 8] Lamar lacks standing to challenge those exemptions because its applications would have been denied as digital billboards with or without the allegedly content-based exemptions to the permitting requirement. *See Outdoor One Commc'ns, LLC*, 2021 WL 5974157, at *3 (finding that plaintiff could not challenge content-based exemptions to permit requirement because "whatever category Outdoor's sign might fall under, it would still be too big") (citing *Midwest Media*, 503 F.3d at 461-62).

Lamar has not established that it was injured by the ordinance's permitting requirement, or that the permitting process intimidated it into censoring its speech. Instead, it "went through the permitting process and was denied because its signs were [digital]." *Id.* at *4. Accordingly,

- 33 -

the plaintiff lacks standing to challenge the permitting scheme as a prior restraint, and the defendant is entitled to judgment as a matter of law as to Count 4.

### IV.  The Motion to Strike Request For Compensatory Damages

LFUCG has requested that Lamar's request for compensatory damages and any evidence of such damages be stricken.  [Record No. 66] Because, however, the Court has granted the defendant's motion for summary judgment with respect to all claims in the plaintiff's Complaint, the motion to strike will be denied as moot.

### V.  Conclusion

To summarize, Lamar's motion to exclude the testimony and opinions of Dr. Kelly will be granted, in part, and denied, in part.  The Court excludes the expert's legal conclusions, use of specialized legal terms, and references to caselaw.  However, the Court will not exclude the entirety of his report because the methodology and factual bases for his opinions are sufficiently reliable under Rule 702.

LFUCG's motion for summary judgment will be granted and Lamar's motion for partial summary judgment will be denied.  Lamar has not demonstrated that it has standing to sue with respect to any of the counts in its Complaint.  Regarding Counts 1 and 3, Lamar lacks standing to challenge the ordinance's regulation of EMDS signs because it has not demonstrated that its applications would be granted if the challenged exceptions to the ban on EMDS signs were struck down.  Lamar lacks standing regarding Count 2 because it cannot trace its injury to the provisions listed in that claim.  Finally, Lamar does not have standing to challenge Count 4 because it has not demonstrated how its alleged injury independently resulted from the permitting process.

Accordingly, it is hereby

- 34 -

**ORDERED** as follows:

1.      Plaintiff The Lamar Company, LLC's motion for partial summary judgment [Record No. 63] is **DENIED**.

2.      The plaintiff's motion to exclude the opinions of Dr. Eric Kelly [Record No. 64] is **GRANTED, IN PART,** and **DENIED, IN PART.**

3.      Defendant Lexington-Fayette Urban County Government's motion for summary judgment [Record No. 65] is **GRANTED.**

4.      The defendant's motion to strike the plaintiff's request for compensatory damages [Record No. 66] is **DENIED** as **MOOT**.

Dated: June 12, 2023.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky

- 35 -